UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                                                                                                        Dkt. No. 15-CR-095 (AJN)

       v.

DOMINICK SHERLAND,

                Defendant.

------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT DOMINICK SHERLAND'S SEVERANCE MOTION**

Edward V. Sapone, Esq.
Chase Ruddy, Esq.
Kaitlyn Devenyns, Esq.
Sapone & Petrillo, LLP
One Penn Plaza, Suite 5315
New York, New York 10038
Telephone: (212) 349-9000

Todd Bussert, Esq.
Frost Bussert LLC
129 Church Street, Suite 226
New Haven, CT 06510
(203) 495-9790

# **INTRODUCTION**

I am counsel to Defendant Dominick Sherland. I write to respectfully request that the Court order that Mr. Sherland remain severed from Defendant Donque Tyrell and that they be tried separately.

Originally, Mr. Sherland was scheduled to be tried on November 6, 2017 jointly with Tyrell and Defendant Carletto Allen. On September 26, 2017, the government moved to sever Allen from Tyrell and Mr. Sherland. At a status conference on October 5, 2017, the Court ordered the severance of Defendant Allen, and his trial remained scheduled for November 6, 2017. At the conference, the government indicated its intention to file a superceding indictment against Tyrell charging him substantively with aiding and abetting the murder in aid of racketeering of victim Keshon Potterfield. The Court set a new trial date of January 2, 2018 for defendants Sherland and Tyrell.

On October 25, 2017, Sherland and Tyrell appeared at another conference during which Tyrell was arraigned on the (S9) superceding indictment which charged him with, among other things, the murder in aid of racketeering of Keshon Potterfield. The government indicated that Tyrell's case needed to be submitted to the Capital Review Panel of the DOJ in Washington, D.C., and because of that, the government would not be ready to try Tyrell in January. Meanwhile, Mr. Sherland refused to waive his right to a speedy trial past the scheduled January 2 trial date. The Court ordered that Mr. Sherland would be tried alone on January 2, 2018, and Mr. Tyrell on April 8, 2018. Lee Ginsberg, Esq. and Mark Demarco, Esq. were appointed from the CJA Capital Panel to represent Tyrell.

On November 30, Tyrell's case was reassigned to Judge Jed S. Rakoff, and at a conference on December 11, 2017, the Court rescheduled Tyrell's trial for May 21, 2018.

In late November, during the course of preparing for Mr. Sherland's upcoming January 2 trial, I received DNA evidence which allegedly implicates Mr. Sherland in the May 15, 2010 murder of Jeffrey Delmore. For the reasons set forth in our December 8, 2017 letter to the Court and at the conference on December 11, 2017, Mr. Sherland requested an adjournment of his trial so that he may prepare to effectively challenge this DNA evidence.

The Court granted Mr. Sherland's request to adjourn the trial date. The question now is whether Mr. Sherland's case should be rejoined with Mr. Tyrell's for trial, or whether Mr. Sherland's case should remain severed.

**POINT**

**Severance Should Be Ordered Under Rule 14
Because The Introduction of Certain Evidence Against
Defendant Tyrell Will Result In Spillover Prejudice, And
The Potential Joinder of Mr. Sherland With A Capital Defendant
Will Otherwise Compromise Sherland's Right To A Fair Trial**

The Court should continue its order of separate trials for Sherland and Tyrell. Judicial economy, fundamental fairness and evidentiary problems that would be created by a potential joint trial all favor continued severance in accordance with Rule 14(a) of the Federal Rules of Criminal Procedure.

Rule 14 provides that, "[I]f it appears that a defendant or the prosecution is prejudiced by a joinder ... of defendants ... for trial together, the court may order … a severance of defendants ...." A severance should be granted whenever "there is serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

The Court in *Zafiro* explained that "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id*. Evidence admitted against a codefendant could "spill over" to the defendant and lead to an unjust conviction. *See id*. When multiple defendants are tried together and they have markedly different degrees of culpability, this risk is heightened. *See id*., citing *Kotteakos v. United States*, 328 U.S. 750, 774-75 (1946). While an important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the guilt or innocence of each individual defendant, "[a] co-defendant in a conspiracy trial occupies an uneasy seat…. It is difficult for the individual to make his own case stand on its

3

own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *Krulewitch v. United States*, 336 U.S. 440, 454 (U.S. 1949) (J. Jackson concurring).

The risk of substantial prejudice and the need for severance is even greater when the unrelated evidence reflects activities of a violent nature. *See United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991).

The government alleges that Mr. Sherland, from 2007 to 2016, while he was age 14 to 23, was a member of a Bronx-based street gang known as the "Big Money Bosses" or "BMB". According to the government, BMB trafficked narcotics on and around White Plains Road in the Bronx, and carried firearms and engaged in acts of violence against rival gangs in the Bronx, at least in part, to protect their drug trade from encroachment.

Among the actions Mr. Sherland is alleged to have taken as a member of the racketeering conspiracy, and which we expect that the government will seek to prove at trial are: (1) that he sold marijuana; (2) he engaged in "brawls," including (a) a 2008 brawl in the vicinity of white plains road; (b) a 2008 brawl in Co-op City; (c) a November 2010 brawl in the vicinity of Gunhill Road; (d) a March or April 2011 brawl in the vicinity of Clinton High School in the Bronx; and (e) an April 14, 2015 brawl outside the state courthouse in the Bronx; (3) when he was fourteen years old, he engaged in robberies, including (a) a December 5, 2007 robbery in the vicinity of White Plains Road and Penfield Street, where he allegedly took a sidekick cell phone and iPod from a victim; (b) a December 24, 2007 robbery in the vicinity of East 224th Street and Barnes Avenue, where, along with a group of others, he allegedly took the victim's cell phone; and (c) a January 4, 2008 robbery in the vicinity of White Plains Road and East 225th Street, where, with a group of others, he allegedly took the victim's wallet; (4) he possessed a gun; (5) on February 11, 2009, he accompanied co-defendant Nico Burrell to the Eastchester Gardens

housing projects where Mr. Burrell shot at someone; and (6) on May 15, 2010, while aged 17, he stabbed Jeffrey Delmore once in the chest with a knife, from which wound Mr. Delmore later died.

As a result, Mr. Sherland is charged by indictment with: racketeering conspiracy, in violation of 18 U.S.C. §1962(d); murder in aid of racketeering, in violation of 18 U.S.C. §1951(a)(1), (2); narcotics conspiracy, in violation of 21 U.S.C. §§841(b)(1)(A), (b)(1)(B); distribution of narcotics within 1,000 feet of a playground or school, in violation of 21 U.S.C. §§846 and 860; use of a firearm in furtherance of Count One (racketeering) in violation of 18 U.S.C. §924(c); and use of a firearm in furtherance of Count Three (narcotics), in violation of 18 U.S.C. §924(c).

Among the actions Tyrell is alleged to have taken as a member of the racketeering conspiracy, and which we expect that the government will seek to prove at trial are: (1) on November 15, 2011, in a subway train while in the vicinity of White Plains Road and Burke Avenue in the Bronx, he and others punched, kicked, and stabbed a victim; (2) on November 16, 2013, in the vicinity of 4030 Laconia Avenue, Mr. Tyrell fired a gun at an individual striking them once in the chest; (3) on March 28, 2014, in the vicinity of White Plains Road and 224th Street in the Bronx, Mr. Tyrell brandished a black firearm and robbed a victim of a cell phone; (4) on June 20, 2014, in the area of White Plains Road and 216th Street in the Bronx, Mr. Tyrell and others confronted an individual and one of Mr. Tyrell's co-defendants fired five gunshots, one of which struck a bystander in the arm; (5) on June 22, 2014, in the vicinity of White Plains Road and 232nd Street, Mr. Tyrell, armed with a gun with a laser-sight, backed up one of his co-defendants who shot and killed Keshon Potterfield; (6) on September 1, 2014, in the vicinity of White Plains Road and 241st Street in the Bronx, Mr. Tyrell brandished a firearm and attempted

to rob a cab driver; and (7) on April 1, 2015, Mr. Tyrell and one of his co-defendants participated in the robbery of a convenience store in the vicinity of Boston Road in the Bronx.

As a result, Tyrell is charged by indictment with: racketeering conspiracy, in violation of 18 U.S.C. §1962(d); murder in aid of racketeering, in violation of 18 U.S.C. §1951(a)(1), (2); narcotics conspiracy, in violation of 21 U.S.C. §§841(b)(1)(A), (B) & (C); distribution of narcotics within 1,000 feet of a playground or school, in violation of 21 U.S.C. §§846 and 860; and use of a firearm in furtherance of Count One (racketeering) in violation of 18 U.S.C. §924(c).

While the charges against Sherland and Tyrell appear similar, and they are both alleged to be members of BMB, the actions that each allegedly took in furtherance of the conspiracy are very different, and there is virtually no overlap in what the government would seek to prove against each defendant. On the whole, Tyrell's alleged actions are of a much more violent character than are Mr. Sherland's, including multiple attempted and completed armed robberies, shootings, and the murder of Keshon Potterfield, for which capital treatment is currently being considered. If tried together, Mr. Sherland's jury would be forced to hear all of the evidence of Mr. Tyrell's alleged violent actions, and could impute those actions to Mr. Sherland, notwithstanding any attempt at fashioning a limiting instruction. As such, Mr. Sherland faces a serious risk of spillover prejudice if he is tried jointly with Tyrell.

Further, Mr. Sherland has what we believe will prove to be a strong DNA defense that might not be available to Tyrell. The N.Y. Office of Chief Medical Examiner has discontinued its use of the FST method of analyzing DNA mixtures that was used to arrive at its opinion that Mr. Sherland's DNA was included on the handle of the Delmore murder weapon. It appears that computing shortcuts could have generally affected the FST computations. Also, there is at least

one school of thought that FST should not be used for reporting statistical weights for forensic DNA mixture comparisons as was done in this case. In short, we believe that we will be able to show that the FST method and the OCME's opinion are unreliable.

The government will no doubt argue that Rule 14 does not require severance even if prejudice is shown, and that less drastic measures, such as limiting instructions will suffice to cure any risk of prejudice. But the Second Circuit has counseled that the presumption that jurors will adhere to limiting instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity." *United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 2001)(noting that in a case where prejudicial spillover is "overwhelming," jury instructions cannot be presumed to be effective).

With respect to Mr. Tyrell's pending murder in aid of racketeering charge, another substantial issue, is that his case is currently being considered by the Capital Review Panel, which could authorize the government to seek the death penalty against Tyrell. Mr. Sherland, even though facing a similar charge related to the death of Jeffrey Delmore, is not a capital defendant, and could not be because of his age at the time of Mr. Delmore's death. In addition to the danger of spillover prejudice, the unique constitutional considerations present in capital cases counsel in favor of severance in multi-defendant trials where not all of the defendants are charged with capital offenses. *See e.g. United States v. Williams*, 181 F. Supp. 2d 267, 303 (S.D.N.Y. 2001) (granting severance and noting that "the participation of the death-eligible defendants in the case may cause the case to proceed on two different tracks and judicial economy may not be best served by conducting a joint trial in this case"); *United States v. Maisonet*, 1998 U.S. Dist. LEXIS 9696 at 12-13, No. 97CR0817 (S.D.N.Y. 1998) (granting severance in part due to the fact that "additional procedures may be required to safeguard the due

process rights of the defendants as to whom the death penalty may be sought. The participation of the death penalty-eligible defendants in the case thus may cause the case to proceed on two different tracks"); *United States v. Haworth*, 168 F.R.D. 658, 659-60 (D. N.M. 1996) (granting severance and noting that at a joint trial, the non-capital defendants "will be compelled to sit through a great deal of testimony having only minimal, if any relevance to them," and that their appointed attorneys "will be paid for their time at great expense, despite the marginal necessity for their participation").

A Joint Trial Will Not Promote Judicial Economy

The potential capital prosecution against Mr. Tyrell would change and complicate the jury selection procedure at a joint trial. In order to obtain a death qualified jury that can fairly consider the charges against Tyrell, the Court and counsel must engage in a lengthy and probing jury selection process. Prospective jurors would be questioned not only regarding matters related to Tyrell's guilt or innocence and the possibility of a death sentence, but also regarding potential prejudice to Mr. Sherland, including prejudicial spillover arising from the potential joinder in this case. Lawyers for both defendants would then be required to consult regarding follow up questions and the exercise of challenges.

The Court Will Be Confronted with Complex Issues Regarding
The Conduct Of *Voir Dire* And The Exercise of Peremptory Challenges

In the context of joinder of capital and non-capital defendants, the Court would be required to make decisions regarding the number of peremptory challenges for the parties. Rule 24 (b)(2) provides that in a non-capital case, the defense is allowed ten peremptory challenges, while the government is limited to six. Under Rule 24 (b)(1), however, capital defendants and the

8

government are each allowed twenty peremptory challenges. The rule is silent regarding how joined capital and non-capital defendants may properly exercise those challenges. At a joint trial, the Court would need to decide the following questions - among others: (1) do the capital and non-capital defendants have a right to separate peremptories, to be exercised individually; (2) if so, how many; and (3) if not, how many peremptories will the Court provide to the parties, in its discretion?

Further, considerations of fairness would arise because as a capital defendant, Mr. Tyrell would likely have a very different focus during *voir dire* than Mr. Sherland. Capital defendants have dissimilar strategic interests in jury selection because they must choose jurors with an eye toward a potential penalty phase proceeding. A capital defendant, therefore, will often seek to *voir dire* prospective jurors regarding potential mitigation themes that implicate, and are prejudicial to a non-capital defendant, such as issues related to remorse, acceptance of responsibility and relative culpability.

Moreover, due to the tensions inherent between the defense case in the guilt phase and penalty phase of a capital trial - i.e., denying guilt and then seeking to mitigate punishment by accepting responsibility or demonstrating remorse in the penalty phase -- the capital defendant might seek to make strategic concessions regarding certain elements of the charged offenses during *voir dire* in order to lay the necessary groundwork for a successful mitigation case. The capital defendant, therefore, often has a vital interest in revealing certain information that would be contrary to the defense strategy of, and/or prejudicial to a non-capital defendant, information to which the panel would ordinarily not have access if the trial were severed. The Court will then have to decide whether a non-capital defendant like Mr. Sherland should be penalized by a capital co-defendant's revealing such information, thus prejudicing the non-capital defendant's

guilt trial, or whether the capital defendant should be precluded from engaging in discussions related to certain mitigation issues, thus prejudicing the capital defendant in the event that there is a penalty phase.

Trial By A Death-Qualified Jury Is Inherently Prejudicial

The reason courts are well-inclined to sever non-capital from capital defendants is the unique prejudice which a non-capital defendant faces when tried in a capital case. This prejudice arises from the unique nature of capital jury selection. In order to sit on a capital case, a juror must be "death qualified" within the meaning of *Wainwright v. Witt*, 469 U.S. 412 (1985), *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and their progeny. This means that the potential juror must be willing to impose the death penalty in appropriate circumstances. This requirement eliminates many potential jurors with strong scruples against the death penalty and dramatically changes the nature of the jury pool to which the non-capital defendant would be otherwise entitled were he tried separately from the capital defendant. The Supreme Court, while holding that a non-capital defendant's constitutional right to an "impartial jury" drawn from a "fair cross section" of the community is not violated by a "death qualified jury," has acknowledged that "death-qualified" juries are "somewhat more conviction prone than non-death-qualified juries." *Lockhart v. McCree*, 476 U.S. 162, 173 (1986); *see also Buchanan v. Kentucky*, 483 U.S. 402 (1987). The experiences of federal courts in death penalty cases over the past 30 years since *Lockhart* and *Buchanan* were decided, as well as a plethora of empirical evidence, reinforce that conclusion. This has prompted the vast majority of district court judges to exercise their discretion under Rule 14 to grant such severances.

According to a survey completed by the Federal Death Penalty Resource Center in 2004, 65 federal death penalty prosecutions since 1988 commenced trial, in which capital and/or non-capital defendants were initially joined. In 45 of these cases, or approximately 69%, the court granted severance, of capital or non-capital defendants, or both. Fourteen of the cases involving a single capital defendant and non-capital co-defendants reached the trial stage. Severance was granted to the non-capital defendants in 10, or approximately 71 % of these cases. *See United States v. Chandler* (N.D. Ala. No. CR-90-H-266-E); *United States v. Pretlow* (D.N.J. 90-CR-238); *United States v. Garza* (S.D. Tex. No. CR-93-009); *United States v. Anthony Jones* (D. MD. No. WMN-96-0458); *United States v. Stitt* (E.D. VA 2:98CR47); *United States v. Sanders* (D. AL CR No. 98-0056-CB); *United States v. Garrett* (S.D. GA CR No. 4-99-133); *United States v. Martinez* (C.D. CA CR No. 99-83-(A)-DT); *United States v. Odell Corley* (N.D. IN CR No. 02-CR-116-ALL); *United States v. Dixon* (E.D. NY CR No. 01-CR-389).

Virtually all academic studies have concluded that "death-qualified juries" are more likely to convict or to convict on more serious charges than juries on which opponents of capital punishment are permitted to serve. The more recent studies are far more sophisticated and convincing than those before the Supreme Court in *Buchanan*. Both lower courts and many commentators have suggested that the Supreme Court would reconsider the issue and find a constitutional violation in trying a non-capital with a capital defendant were the issue properly presented to it today. *See United States v. Green*, 324 F.Supp.2d 311, fn. 14 (D.Mass. 2004)(collecting studies); Acker, Bohm, Lanier, America's Experiment with Capital Punishment. 2d Ed. (Carolina Academic Press, 2003), Chap. 13, Sandys and McClelland, *Stacking the Deck for Guilt and Death: The Failure of Death Qualification to Ensure Impartiality,* pp. 391-93; Cochran, *Courting Death: 30 Years since Furman, Is The Death Penalty Any Less*

*Discriminatory? Looking at the Problem Of Jury Discretion in Capital Sentencing.* 38 Val. U. Rev. 1399 (2004); Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation,* 38 Ariz St. L. J. 769 (2006) (reviewing data and concluding that death qualification results in juries that are more conviction prone); Allen et al., *Impact of Juror Attitudes About the Death Penalty on Juror Evaluations of Guilt and Punishment: A Meta-Analysis,* 22 Law & Hum. Behav. 715, 724-25 (1998) (reviewing data and concluding death qualification results in juries more likely to find guilt and vote for death); Bowers & Foglia, *Still Singularly Agonizing: Lcnv's Failure to Purge Arbitrariness from Capital Sentencing,* 39 Crim. L. Bull. 51, 84-85 (2003) (death qualification "leaves an especially conviction-prone and punishment prone group of individuals to decide capital cases"); Ogloff & Chopra, *Stuck in the Dark Ages: Supreme Court Decision Making and Legal Developments,* 10 Psychol. Pub. Pol'y & L. 379, 391 (2004) ("Death-qualified juries may be more disposed toward guilty verdicts than juries that include [ death penalty opponents] because jurors who are not opposed to the death penalty may be more generally conviction prone than [death penalty opponents].") (citing Cowan et al., *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation,* 8 Law & Hum. Behav. 53 (1984)).

Recent studies also show that the very *voir dire* process which is used to assure a fair jury at the penalty phase tends to prejudice jurors against acquittals at the guilt/innocence phase. *See id.*; John H. Blume, Sheri Lynn Johnson, A. Brian Threkeld, *Probing "Life Qualification" Through Expanded Voir Dire,* 29 Hofstra Law Review 1209 (2001). Several qualitative studies have also found that jurors who were exposed to the potential punishment during jury selection had a propensity to believe the subtext of the *voir dire* was about appropriate punishment, rather than guilt or innocence. *See, e.g.*, Cochran, *Note, Courting Death: 30 Years Since Furman, Is the*

*Death Penalty Any Less Discriminatory? Looking at the Problem of Jury Discretion in Capital Sentencing,* 38 Val. U. L. Rev. 1399 (2004). No less than a sitting member of the United States Supreme Court has publicly condemned the nefarious effects of a unitary, death-qualified jury. Justice John Paul Stevens, Remarks at the Thurgood Marshall Awards Dinner (Aug. 6, 2005) (death qualification "creates an atmosphere in which jurors are likely to assume that their primary task is to determine the penalty for a presumptively guilty defendant") (available at http://www.supremecourtus.gov/publicinfo/speeches/sp 08-06-05 .html). Capital *voir dires* focus intensely on the question of whether jurors can impose a fair sentence. This subtly communicates to jurors an assumption that all participants in the trial expect a conviction. While this may be in the interest of the capital defendant who wants to candidly convey that his primary goal is to avoid a death sentence, the damage to the non-capital defendant, who is seeking an acquittal, is plain. Limiting instructions to the effect that the jury should consider the defendants separately have been found to be less than effective. *See Bruton v. United States*, 391 U.S. 123, 129 (1968) ("[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction ... " *quoting Krulewitch v. United States*, 336 U.S. 440, 453 (1949); *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ("[L]imiting instructions cannot be regarded as a guaranty against prejudice; the risk of prejudice to co-defendants despite limiting instructions has been specifically noted by this Court").

Recent studies further show that capital juries, despite instructions by the court to the contrary, often consider and make up their minds about the potential sentence during the guilt/innocence phase. Bentele & Bowers, *How Jurors Decide on Death: Guilt is Overwhelming,· Aggravation Requires Death; and Mitigation is no Excuse,* 66 Brooklyn L.Rev. 1011 (2001 ). Defense attorneys recognize this and, while not overtly conceding their client's

13

guilt, often utilize the guilt/innocence phase to "seed in" their mitigation evidence in anticipation of the penalty phase. This type of strategy has been approved by the Supreme Court, (*see, Florida v. Nixon*, 543 U.S. 175 (2004)), and likewise communicates to the jury a not-so-subtle message: the defendant is guilty, but not so bad that he should die. A non-capital defendant who is tried with a capital defendant faces the daunting task of seeking an acquittal before a jury for whom the presumption of innocence has all but been eviscerated.

Given that this court has "the inherent power to sever trials in the interest of efficient judicial administration," (*United States v. Nachamie*, 101 F. Supp. 2d 134, 151 (S.D.N.Y. 2000); *see also United States v. Losada*, 674 F.2d 167 (2d Cir. 1982); *United States v. Lasanta*, 978 F.2d 1300 (2d Cir. 1992)( severance and other similar relief rests entirely in the discretion of the trial court)), the practical concerns articulated above in and of themselves are sufficient grounds to warrant the continued severance of defendants Sherland and Tyrell in this case.

The government might argue that our analysis is premature because the Capital Review Panel has not rendered a decision about whether it will seek death in Mr. Tyrell's case. However, that decision may not come for weeks or months. As set forth at the December 11, 2017 conference in Mr. Sherland's case, numerous witnesses need to be secured, from a small pool of qualified experts, to analyze the DNA evidence in Mr. Sherland's case, the available information about the NY OCME's prior DNA testing procedure for mixtures (pursuant to which Mr. Sherland's DNA was tested), and the new procedure employed by the OCME. Those witnesses' availability to begin work on the case, and to testify at potential future hearings and trial, needs to be secured in short order, something which would be prejudiced if required to wait on the Capital Review Panel's decision whether or not to authorize death in Mr. Tyrell's case.

For that reason, we believe the Court should continue with severed trials and allow Mr. Sherland to begin preparing his defense on that basis.

## CONCLUSION

For the foregoing reasons, Mr. Sherland respectfully requests that the Court grant his motion and any further relief the court deems necessary.

>
> Respectfully submitted,
>
> */s/ Edward V. Sapone*
> Sapone & Petrillo, LLP
> *Counsel to Defendant*
> *Dominick Sherland*
> 1 Penn Plaza, Suite 5315
> New York, New York 10119
> Telephone: (212) 349-9000
> Facsimile: (212) 349-9003